Good morning. My name is Eric Fisher. I'm representing the appellant here, and I'd like to reserve four minutes for rebuttal. This Court has repeatedly held in prior cases that issues in a Social Security case cannot be denied by the agency for no reason or the one reason. That goes back to Cotter v. Harrison. It's been reiterated over and over again, I guess most notably in Plummer v. Apfel at 186 F. 3rd 422-429 and Mason v. Shalala. What did the ALJ, when he got it back on remand, what should he have done? I think there are a couple of things he should have done, Your Honor. I mean, the first thing is he was under order by the Appeals Council to have the non-examining medical expert testify at the hearing. And I think that was important, Your Honor, because of the complexity of the impairments in this case. Even the ALJ conceded that there were, depending on how you calculate the fee, nine or ten separate severe impairments here. There's a couple of others that we've raised as well. Eighteen enlisted in all. Excuse me, I'm sorry. Eighteen enlisted in all. Is that right? Eighteen impairments. Enlisted. Well, enlisted impairments were interesting, Judge, because that implicates another issue. One of the severe impairments, of course, was obesity. And one of our arguments, of course, is that the judge was obligated to apply Social Security Rule 02-01P because the obesity was concededly severe. Now, there used to be a listing section for obesity. I believe it was Section 9.09. It was eliminated five to six years ago. And Social Security Rule 02-01P was substituted for it. Absent an equivalency determination on the severe obesity issue, accumulating all the severe conditions together. In fact, severe obesity would not be subject to any Step 3 review at all. Obviously, the administrative regs talk about looking at matters in combination. Yes, sir. But did you raise that issue before the ALJ? Well, Your Honor, the judge purports to have done that without giving any reason whatsoever for doing it. Did you raise the issue to the ALJ? I did not, I don't think, specifically say to the ALJ. He was obligated to review the conditions cumulatively. But this is an ALJ. He's been doing this for 20 years, Your Honor. He knows what the regulations are. And that does not obviate his responsibilities here. I would say, Your Honor, in questioning the vocational expert, we asked various questions that did implicate various of the impairments. But I guess the question, if you have, I mean, only at Step 5 does the burden switch. Correct. Should the other party. If you have the burden at Steps 1 through 4, doesn't that mean you have to tee up the issue? You're arguing that the, I guess it's 416.923 of the Code of Federal Regulations, it is, has imperative language that ALJs must take this into account, even so long as you present the combination of impairments. Correct. But don't you have to say, okay, there's a combination here that causes us to, that causes this person to be disabled. And further, don't you have to say which combination? I mean, if you've got, and as I said, I counted up about 18 possible impairments, don't you have to say it's this one with this one, or all 18 together, or something? Your Honor, the judge, in fact, does, has, presupposes that he has combined at least these 10 impairments together. Right. Would we not want to know which impairments are being alleged to be cumulative, thereby causing disability? Well, Judge, we did raise all these impairments. I developed the case. I got all the evidence for the judge. There is certainly, at the very least, no doubt that there are 10 separate severe impairments. If the issue is some of the others and whether they're severe or not, we have evidence on those things. Some of them were not specifically ruled on by the judge, though he acknowledged them. But in reaching his residual functional capacity, there's been no allegation by the government that the judge did not combine at least the 10 impairments that he found to be individually severe. So that really is an issue as to that. The judge in the decision does discuss the sclerosis of the left ankle, but doesn't specifically issue a ruling on whether that's severe or not. But how do the impairments that you brought out combine to demonstrate total disability? Well, the standard, I would argue the standard is not really total disability. I'm sorry. How do the standards that you allege combine to demonstrate that this person is disabled through all five steps? I would suggest, Judge, if you review—I'm sorry, Judge. Go ahead. I would suggest that if you combine the residual functional capacities assessed by every examining doctor who examined the physical side of the equation and the mental side of the equation, every single one, whether they are our doctors or the government's doctors, when those are viewed in combination, concluded that the claimant was disabled from all competitive work. So, for example, on the physical side, even the administrative law judge concedes just based on the physical side of the equation that my client would be limited to a restrictive range of sedentary work. The judge rejects every psych source in the record, both the client's and their own psych sources, who find very significant additional psychiatric problems. In fact, wasn't the GAF score put your client at a margin, but a functional margin, right? There is one GAF score, Judge, of 60, that's referred to by administrative law judge. But the Social Security Administration, as we have pointed out in the record, takes the position that GAF scores do not correlate accurately to work functioning. And that's consistent with Social Security ruling 8515 and also this court's decisions in cases like Morales v. Apfel, which recognize that there are added stressors inherent to work that are not present with someone who is leading a homebound existence in a regular psychotherapy. Are we not bound, though, to give tremendous deference here to the ALJ's findings on this substantial evidence standard and say if that ALJ sees in the record a score which shows low but marginal functionality in social settings, there's a basis for saying there can be functionality in social work settings? Not, Your Honor, just based on one global assessment of functioning score. I would concede that if there were lots of those scores and they were all relatively high, and certainly in a pressure situation, that that might be a critical factor. Certainly, I can't argue it's irrelevant, and I can't argue the judge shouldn't mention it. But page 32 of the Diagnostic and Statistical Manual makes very clear that the global assessment of functioning scores that are current only reflect the functioning of that particular session. They do not reflect a longitudinal function over time. So even conceding that at that one occasion the client in the context of psychotropic medication, regular psychotherapy, and a homebound existence functioned at a global assessment function of 60 is known to see the ability to function in a competitive work setting. One thing I find especially interesting here is if you look at the judge's assessment under Step 3, just viewing the mental condition isolation, the only limitation the judge finds is a moderate limitation in social interaction. Now, the social security regulations never formally define what moderate means. Historically, what they say in the regulations is it's more than slight and it's less than marked. And marked is not the most extreme category. Extreme is, which is a much more severe impairment. It is interesting that at page 535 of the transcript, in a new form that social security has been using to assess severity categories, they redundantly define moderate to mean moderately limited. But that is equivalent to the ability to function in a satisfactory way. And I would state, Judge, that looking at the record here, any kind of allegation by the administrative law judge here that the evidence supports a finding that my client's social functioning, social interaction, equates to a satisfactory ability to function at Step 5, which means in the context of full-time, 40-hour-a-week employment, is just utterly ridiculous. Every examining source, including Dr. Griffin and Dr. Herman, the social security doctors, have indicated in the context of any kind of pressure, my client decompensates and has conflicts. The Warren E. Smith treatment records document these arguments and conflicts over and over and over again. So let me make sure I got it right. Your assertion is that the ALJ just totally ignored that evidence. He selectively quotes from evidence and leaves out things that do not support his position. So what does he selectively quote? From your view, what is it he's relying on? Is there anything other than that GAF score that he relies on to say there's functionality and that you think is not sound? Well, for example, Your Honor, he rejects Dr. Herman, who is the social security administration's examining psychiatrist, who examined the client three times, because under the theory that my client's arguments don't escalate up to physical fights. That's one reason he gives. Now, not only is the vocational expert testified here in response to my question that merely arguing one or two times with a supervisor would lead to dismissal. But, of course, that is not consistent with what the evidence says. My client, Your Honor, has been found to have no past relevant work, not because he's never worked, but because every job he's ever had has inevitably ended badly, very quickly. So the record without contradiction indicates, for example, my client at one job had an argument with the boss's son and burned down the factory in consequence to punish the boss and went to prison for arson. On another occasion, we had a cleaning job. He started arguing with his boss, and it ended up in a brawl, and he was fired from that job. Even on that hearing day, at the last hearing, Judge, as is reflected in the record, my client entering the building, at that time the hearings were in the U.S. Customs House, had an altercation with the guards at the U.S. Customs House and was physically thrown out of the building. I had to go downstairs, and that's reflected in the record, just to get him in. So this idea that he could interact occasionally, which means up to a third of a normal work day, with supervisors and coworkers without having any conflicts or problems and keep the job is utterly ridiculous. There is absolutely no support whatsoever for that. I've got you on that. I have one factual question I'd like to ask. At one point, there's a statement in the record. I mean, the IQ assessments are typically in the low 70s, but there's one that's down like 40, and I just got to believe that's an error. Would you agree that's an error in the record? I believe, Your Honor, it is an error. We're not claiming he is retarded. We are claiming that he has borderline intellectual function, which in and of itself would have restricted him to simple jobs. In fact, he's never done anything in excess of simple jobs. Even a Social Security employee who did the initial interview indicates that he was illiterate and unable to complete the forms, and so the Social Security employee had to fill out the forms for him. Okay. Thank you. Good. We'll have you back. Okay. Good morning. Good morning, Your Honors. May it please the Court, my name is Roxanne Andrews, and I represent the Commissioner of Social Security. Your Honors, in this case, it's about a man who does have several impairments but can still work. Contrary to Mr. Cooper's argument, the ALJ— But his argument is that the ALJ did not consider the combined effect of all of the impairments. Now, the language of Section 416.923 of the Code of Federal Regulations uses the phrase that we will consider the combined effect of your impairments. Isn't that fairly strong language? It is, Your Honor. Does it really place a duty on the Commissioner? It is, Your Honor, and the Commissioner met his duty in this case. The Commissioner— And how did that happen here? Your Honor, in the ALJ's decision, the ALJ, first of all, found that Mr. Cooper had eight severe impairments. And through his decision, the ALJ went on to discuss the impairments in combination. Where is that? Because it looked like the impairments were discussed separately at Step 3. At Step 3, Your Honor, the ALJ stated that he discussed Mr. Cooper's obesity in particular with the other impairments. And finding that Mr. Cooper—Mr. Cooper's impairments did not meet any of the listings, and as— Well, I'm looking then at the decision of the ALJ. Do you want to point out where you think that's the case? Your Honor, at transcript number— Better give me the page number. I'm sorry, at the transcript. I'm sorry, page 60 of the transcript. Is that right? You okay? No, Your Honor, I'm not okay. Okay, why don't you sit down for a second? Thank you, Your Honor. You okay? Let's get some help. Go ahead. Should we take a break? Yeah, we'll take a break. Yeah. Yeah, we'll take a break. Let's take a 10-minute break at this time. Thank you. I'm not going to drop it. I can take it. It's okay. You all right? I can handle the rest of it. Okay. Thank you. Your Honor, this is Roxanne Feldman. Oh, I'm sorry. I'm sorry. We're going to call it a day. Thank you, Your Honors. Thank you, Your Honors, for your consideration, and to Mr. Cooper, I do appreciate it. No, you did not have a problem at all. I think where we left off was that I was asking you, in connection with the opinion of the ALJ, where was it that the ALJ had considered impairments in combination? Your Honor, at transcript page 22, the ALJ discussed Mr. Cooper's impairments in combination, specifically stating that he was going to discuss obesity in combination with the other impairments, and looked at obesity… Aren't those all on that page, though? Are the mental impairments discussed or even mentioned? In the listings analysis at page 22, the ALJ did not talk about the mental listings, Your Honor. And as Judge Ambrose noted, Mr. Cooper did not identify any particular listing that he met or equaled, which is his burden. But the ALJ did go on to talk about how the combination of impairments didn't meet the musculoskeletal impairment, didn't meet the cardiovascular impairment, and light up his obesity. And also the ALJ crafted a residual functional capacity assessment, which accommodated all of Mr. Cooper's impairments that are reasonably established in the record. It was an extensive RFC that limited Mr. Cooper to a restricted range of sedentary work, which involves the least demanding physical requirements. And then the ALJ went on to add at least eight other limitations. Let me ask you, though, because I take it from the argument that we've heard from your opposing counsel that the assertion is that the ALJ simply ignored and even in this discussion didn't mention the significant psychological problems that this gentleman suffers from, and that that's fatal to the government's position here. If we read page 22 and a half, and we don't see that the ALJ looked at that, even when saying, I'm looking in combination, how are we to understand or know that the ALJ, in fact, did look at this history of psychiatric problems and included that in looking at the combination? Your Honor, first of all, Mr. Cooper's counsel misstated the facts in stating that the ALJ did not address the mental impairments. Later in the decision, the ALJ talked about the fact that he couldn't rely on Dr. Herman's report because of the psychiatric treatment records from Warren E. Smith Mental Health Center, which shows a two-year gap in treatment, and when Mr. Cooper did get psychiatric treatment, it was only for six months for monthly medication checks. Nothing in the record shows that the combination of Mr. Cooper's impairments rise to the level of listing severity. And the district court agreed with the commissioner on this point and talked about the fact that the ALJ stated he couldn't rely on Dr. Herman's extreme mental assessment because of the treatment from the Warren E. Smith Mental Health Treatment. In addition, there's another consultative examiner in the record, Dr. Griffin. Dr. Griffin evaluated Mr. Cooper at the beginning of the relevant period and found that he did have severe mental limitations, but that he still could attend to tasks and could follow directions and could do so in a work setting. Throughout the rest of the relevant period, although Dr. Herman did evaluate Mr. Cooper three times, the ALJ properly could not rely on him because of the treatment records from the psychiatrist. And Mr. Cooper makes much of a fact that Dr. Herman is examining Mr. Cooper at the request of the commissioner, but the commissioner doesn't accept any medical opinion blindly. It has to be supported by the record and not inconsistent with other evidence. That is why the ALJ, as he discussed, could not rely on Dr. Herman. And the district court affirmed the commissioner on that point, Your Honor. The district court also affirmed the commissioner and noted that the ALJ indeed did look at the impairments and combination. Here's the problem I'm having. When I look at pages 22 of the appendix and pages 24, which are the findings, 22 says in an inclusory way, although the claimant has severe impairments, none of the medical evidence establishes that he has any impairment or combination of impairments, which means or equals any of the criteria listed. And then, among other things, they listed the criteria 12.00, which are mental impairments. So it looks like, although he's saying that it's a combination, it looks like he's looking at them individually, but perhaps not. At the end, however, he perhaps covers that base. In finding two on page 24 of the appendix, the medical evidence establishes that the claimant has severe right-eye blindness, severe coronary artery disease, et cetera, et cetera, severe obesity, and severe bipolar disorder combined with other things, but that he does not have an impairment or combination of impairments that are noted in the regulations. That is a conclusory statement, but where is the rationale that backs that up in order that we can look at this meeting to see if he's correct or not, to see, in other words, whether substantial evidence supports what the ALJ found? Well, Your Honor, as the district court found in adopting the report and recommendation of the magistrate, the record clearly shows that Mr. Cooper was their consultative examiner who assessed his physical limitations and who assessed his mental limitations. And the district court agreed that the ALJ did his job to get a full review of the medical evidence. And throughout the decision, the ALJ has discussed all of the medical evidence. Is there one doctor that has looked at the mental and physical in combination? No, Your Honor. I don't know of a doctor that can look at all the mental and... No, but the ALJ, I mean, he has the authority to make the conclusion he made. Yes, Your Honor. But having made it, he needs to give us a rationale for why these impairments in combination do not fit any listing in Step 3. And I don't see it there. It would seem, you know, maybe you can clarify it on remand, but the argument would be that there should at least be a remand so that we have something to go on. Well, Your Honor, when you look at the residual functional capacity assessment that the ALJ crafted, it addresses, that addresses the combination of the impairments because there are at least eight additional limitations that address the obesity, address... You may be right, but the ALJ needs to go back and say that that's what happened and that's what I was relying on and that's my rationale for making the conclusion that I did. Well, Your Honor, the ALJ does state that he's relied on the consultative exams from Dr. Makus, who's a cardiologist, and Dr. Punjabi, who's an internist, and also on the psychiatric treatment showing that Mr. Cooper... Once again, all of that may be right. He may have looked at all of that. He may have relied on it, but he needs to tell us what it is in those reports that makes him go the way that he did, and I'm not seeing it there. Maybe you mentioned something that would be a good segue to step five. It was said that he could perform the function of an assembler, a laborer, an inspector checker, and a hand packager, but doesn't it take adequate eyesight, for example, to be an assembler or a hand packager or an inspector? And his eyesight is very, very poor. Your Honor, as you stated, Mr. Cooper does have poor eyesight, and the ALJ accommodated that in RFC. The ALJ told the VE that Mr. Cooper was blind in his right eye and had a limited depth perception and reduced visual field. The VE, still with that information, was able to identify these jobs that Mr. Cooper could do, and his vision seems to be corrected with glasses. If he doesn't have depth perception and is blind in one eye, how can he perform these activities which require seemingly good eyes, or at least good eyes once corrected? Well, Your Honor, again, the ophthalmologist stated that Mr. Cooper does have hand motion, even with his right eye, that he has blindness in. And SSR 8515 states, Your Honor, for visual impairments, as long as the claimant has sufficient visual acuity to handle work with rather large objects and visual fields to avoid ordinary hazard in the workplace, then there could be a substantial number of jobs which he could perform. The VE was well aware of that impairment as well as Mr. Cooper's additional impairments. Let me ask you a question about that vocational expert while you're on that subject, Ms. Andrews. The hypothetical, which the ALJ summarized at least on page 23, seems to go into sedentary, unskilled jobs, and Judge Ambrose has gone through that listing. When we go back and look at what the actual hypothetical is, it talks about lifting ability, it talks about 11th grade education, no past work experience, other physical limitations, can't reach overhead, for example, or bend and crawl, blind in one eye, would have to avoid all hazards. And the only thing that appears to be relating to mental or social problems is the last line that talks about not more than occasional contact with supervisors, fellow employees, and the general public. Does that one line there at the end, is that sufficient to capture the mental and psychological problems of this man? In this case it is, Your Honor, because the record shows... You're doing fine. Just tell me why. Because the record shows, Your Honor, that Mr. Cooper, first of all, didn't seek mental health treatment until five years after the relevant period started, after his alleged onset date. And when he did, he went for one exam. The psychiatrist assessed a GAF binding of 60, which is only moderate symptoms. Mr. Cooper, although a treatment plan was formulated, he didn't return for two years. When he did return to that psychiatric treatment facility, he treated for only six months. During that period, he was prescribed low dosages of Xanax and Rimerin. And the psychiatrist noted in the last two monthly checks that he was stable. And so, Your Honor, as the ALJ found and the district court confirmed, because of the treatment records showing the gaps and disability, the ALJ could not rely on Dr. Herman's finding that there were more extreme mental limitations. And, Your Honor, I see that my time has... No, you're answering our questions. Any other questions? I just have one other one. Okay. Would the analysis change now that the person, I believe, is 50, if he were to file a subsequent or another claim for social security disability? Well, actually, Your Honor, Mr. Cooper did file a subsequent application, and that was 17 months after this ALJ's decision. During that period, which is a different case, different time period, the commissioner did grant an award of benefits to Mr. Cooper. He did that based solely on physical limitations, obesity, and essential hypertension. And that was because, in that record, the ALJ, the commissioner sent Mr. Cooper to two more, three more consultative examinations, actually. The mental consultative examination and subsequent record revealed that Mr. Cooper did not even have a severe mental limitation, and the doctor based that on the fact that Mr. Cooper wasn't in treatment, wasn't taking medications, and had a normal mood and was stable, but that psychiatrist did state that Mr. Cooper's physical limitations were affecting his daily activities. The commissioner then sent Mr. Cooper to two consultative examiners. It was the same examiner who did two exams and found that Mr. Cooper's obesity now impacted his cardiac impairment more and his left ankle impairment. Mr. Cooper, at this point, was 50 pounds heavier than he was at the beginning of this relevant period. Therefore, the commissioner did the right thing. There was a deterioration 17 months later. Mr. Cooper had an onset starting 17 months later, not invading this time period. So the commissioner did the right thing there. He has awarded benefits. However, in this case, Your Honors, this record is complete. Mr. Cooper submitted to at least six consultative examiners. His treating doctor, those progress notes really only show weight checks, hypertension checks, and, Your Honor, the ALJs. The record simply does not show that Mr. Cooper is disabled during our relevant period. Indeed, he stated he was doing odd jobs. They didn't rise to the level of an eight-hour day. But any work that a claimant does during the period that he claims to be disabled, that undercuts a claim that he's totally disabled from all work. And Mr. Cooper stated that he was not able to find work despite seeking formal employment due to his prison record, not due to any physical or mental impairment. And although Mr. Cooper's counsel brings up the fact that he did burn down an employer's business, that was 18 years ago. And during the relevant period, Mr. Cooper stated, and you'll find it at transfer page 114, that his medications calmed him down, that his arguments no longer rise to the point that he's getting into physical conflicts. That fire, that was then. This is now. The record in this case and even the subsequent award do not show that his mental impairment rise to that level. So I thank your honors for your extra consideration, and I hope that if you have any further questions, I ask that you rely on our briefs. Good. Ms. Andrews, thank you very much. Mr. Fisher. Yes. I don't think I was involved in this subsequent case because I have no information on what was just said. So I would object to it. I don't think it's relevant here in any way. Well, I mean, actually, in what sense? It may be helpful. I mean, the point is, the question was, is he in another category by virtue of turning age 50 that may be more beneficial to him? And the answer was, yes, he is in another category, and, indeed, he did file, and, indeed, he is getting SSI. Before age 50? No. Because he just turned age 50 a few months ago. When did he turn 50? I believe he just turned 50 in September, if I'm not mistaken. Yeah, I'd kind of be interested to know what this follow-up facts situation is. Yeah, I would, too, because I'm clueless as to what I was going to argue, basically, in some of the things. I just wanted to refer, I mean, the government is saying that Dr. Herman was rejected, that Dr. Griffin was accepted, and Warren E. Smith was accepted. That is not correct. If you look at the Warren E. Smith records, for example, it repeatedly notes in the session notes that he's having arguments with neighbors, with everyone he's coming into casual contact with over and over and over again. The Dr. Griffin report, which is the social security psychologist's report, the government has just picked out a few little things out of context. The judge only mentioned it in a couple sentences, but they've left out critical things. For example, at page 479 of Dr. Griffin's report, he says, in comedy and social functioning, he tends to fight frequently with people, including the one he lives with. Overall, he has had great difficulty over the years getting along with people. He is able to initiate social contacts and communicate sufficiently well. He has no interest in group activities of this kind. He has poor relationships with people in authority, co-workers, and peers or the public. Well, Mr. Fisher, doesn't that tell us that, in fact, the ALJ was looking at these things? You're citing record evidence that the ALJ had in front of him, apparently paid attention to, at least to some degree because it's mentioned. And in the vocational experts, the hypothetical to the vocational expert, there's, again, mention of the need for limited contact because of impliedly social and psychological problems. Don't those things tell us that the ALJ did what the ALJ is supposed to do? Whether or not you like the way he came out, he did what he was supposed to do. You can't take things out of context, Judge. A few sentences and ignore more important things. Also, I would mention these common stressful circumstances, which I think is significant. But the ALJ has to distinguish the things that work counter to his position as well, indicate why they're not relevant, not pick out a sentence out of context, and then make it sound like that is controlling. I mean, ultimately, Your Honor, if you look at the decision, contrary to the decision of the government, the ALJ rejected Dr. Griffin, too. He didn't accept Dr. Griffin's report, nor did he accept Warren E. Smith. He relied on no expert psych evidence, just on his own lay opinion, and rejected everyone else. Similarly, Judge, How do you respond to the assertion by the government that the ALJ looked at the treatment record and based on the fact that your client had sought treatment, apparently he didn't think he needed treatment, evidently. And that's something that the ALJ could certainly take into account in deciding this case. Well, Your Honor, the client, as has been diagnosed with even the ALJ, is having a severe bipolar disorder with manic episodes as well as dyslithymia. The record basically indicates when you look at all the social security consultative doctors, that my client has very poor insight into a situation. But is it relevant, though? I guess that's the question I'm trying to ask you. Your Honor, all these things are potentially relevant. The question is whether added together in the context of the evidence as a whole, does it amount to substantial evidence. There are things the judge can take out of context to support his position, but that is an inappropriate way to proceed here. He must review the evidence as a whole and not just take these isolated things. The other thing I would mention, Your Honor, is that involving the severe obesity, I'd just like to emphasize the judge never mentions an appropriate social security standard, never mentions social security ruling 02-01P, never mentions what obesity severity standard he is applying in any way. So the government's position in district court was there was no obesity standard. We've cited to that in our brief here. They changed their position somewhat up here to say that there is a standard and he comported with the standard. But in fact, he does not state the standard he applied for severe obesity. He does not mention the appropriate standard. So that's pure speculation on the part of the government. I think that's a critical factor because the actual standard itself discusses the critical nature of evaluating severe obesity with severe musculoskeletal impairments. And even the judge concedes there are multiple severe musculoskeletal impairments with severe cardiovascular impairments. The administrative law judge concedes here there's a severe cardiovascular impairment and severe psychiatric impairments. And the administrative law judge concedes that as well. As far as the later evidence, I know nothing about that, Your Honors, and I don't think that is relevant to this particular case. Well, it may or may not be in terms if we remand it. There may be some relevance. That's true, and I think remand is appropriate, Judge. Well, why don't you give us a 28-J letter, both sides, within a week, just telling us what's the current status to the extent that you can find out. Okay, I'm going to have to get that from the government, and I will just contact the client. All right. Then you let them file something, and we'll give you three days afterwards to raise the record. Okay. But I think it would certainly, Your Honor, it would be helpful for me to review that complete record, obviously, rather than isolate things out of context that it's going to be viewed as potentially relevant to the outcome of this case. Well, I don't know if it's potentially relevant, but as I said, if to the extent it's relevant and it may not be, it would seem to help you. Well, I don't know the answer to that until I see some of that evidence, and I would really like to see it. All we're saying is if you could just let us know what the current lay of the land is, what the record to this person is. Good. And if you think you need more time to follow up, you'll let us know. Yes, sir. Thank you. The case was very well argued. Both counsel had encyclopedic knowledge of the record. We thank both counsel. I take the matter under advisement. By the way, while you're there, I can also tell you another case where I think it was Chief Justice Rickett and I were sitting. It was a Seth Waxman case, and we went far longer than they had anticipated. Seth Waxman, who's argued that the former Solicitor General has argued many cases before the United States Supreme Court, doesn't eat on the day of oral arguments. Well, it turns out this oral argument went about six hours, from about nine-something in the morning to about four in the afternoon with a short break. And in the afternoon, one of my clerks was getting a little, you know, kind of woozy, and so she went and got some M&Ms, and she looked over to Waxman, who was sitting at the table, and Waxman looks at her, and he opens his hand, and he has M&Ms in his hand. So, as I said to you before, it happened to the best, and so good luck. Thank you very much, Your Honors. It's a pleasure having you here.  Thank you, Counsel.